UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 19-20722-Civ-Scola

MED-X GLOBAL, LLC,

    *Plaintiff*,

vs.

SUNMED INTERNATIONAL, LLC,
TRAVEL INSURANCE FACILITIES, PLC
(t/n TIFGROUP), et al.,

    *Defendants*.

_____/

**MED-X'S RESPONSE IN OPPOSITION TO SUNMED'S SEPTEMBER 22, 2021, MOTION FOR SUMMARY JUDGMENT**

    Plaintiff, Med-X Global, LLC ("Med-X"), by and through undersigned counsel and pursuant to Rule 56 and Local Rule 56.1, hereby opposes the Motion for Summary Judgment ("MSJ") [D.E. 72] filed by Defendant, SunMed International, LLC ("SunMed"), on September 22, 2021, as follows:[1]

**INTRODUCTION**

    This action commenced on February 25, 2019, and the operative Second Amended Complaint [D.E. 15], was filed on March 28, 2019. This is an action arising out of Defendants' breaches of insurance contract, namely Defendants' decision to deny / underpay covered insurance claims submitted by patient, medical provider, and / or billing agent. *See id.* at ¶ 1. In or around February 2018, the subject patient's health failed while traveling abroad in Mexico and she had to be hospitalized. *See id.* at ¶ 16. Claim number URV288227 (the "Claim") was assigned. *See id.* at

---

[1] Med-X's Statement of Opposing Facts & Additional Facts ("SOF") is being filed separately pursuant to L.R. 56.1(a)

1

¶ 18. Shortly into the subject patient's hospitalization, the patient had to undergo a surgery. *See id.* at ¶ 19. A few weeks into the hospitalization, SunMed started nakedly and / or illegitimately objecting to the hospital's pricing. *See id.* at ¶ 20. Ultimately, this pricing dispute resulted in a significant Claim underpayment by Defendants – the total amount claimed for services provided was / is $863,749.65 and the total amount paid was / is $123,220.64. *See id.* at ¶ 24 and n. 3.

Since the commencement of this action, sorting out the proper party Defendants and their respective roles in the subject matter giving rise to this action has been challenging (put mildly). After various officer-of-the-Court-type representations were received by undersigned counsel during conferral communications throughout the pendency of this action,[2] and as evidenced by various voluntary dismissal notices or stipulations filed by Med-X along the way, the universe of Defendants at issue was narrowed to TIF and SunMed. By Order dated August 25, 2021 [D.E. 63], the Court dismissed TIF based largely (if not entirely) on personal jurisdiction grounds pre- any

---

[2] Colloquially and anonymously put, such representations were along the lines of the following leading up to Med-X's Hague Convention service efforts in the Spring of 2021:

- Jeffrey Greyber, Esq.: "I'd like to try to narrow the universe of Defendants before spending a significant amount of money effectuating service on each of them through the Hague Convention and so as to otherwise streamline this dispute."

- Defense Counsel: "Regarding the overseas Defendants, IWIA and Union had nothing to do with this dispute, because ……… ."

And, so, just a couple days before proceeding with service of TIF, Cost Containment, and Citybond through the Hague Convention, Med-X voluntarily dismissed without prejudice IWIA and Union. *See* [D.E. 37] .

Fast forwarding a couple months, amidst dismissal-related conferral conversations, Joshua Golembe, Esq. (counsel for TIF, Cost Containment, and Citybond) and undersigned counsel sought to further streamline this matter with respect to "unnecessary" parties; hence, the May 13, 2021, Joint Stipulation of Dismissal without Prejudice as to Defendant Cost Containment Facilities, Ltd [D.E. 52] and the Joint Stipulation of Dismissal without Prejudice as to Defendant Citybond Holdings, Ltd [D.E. 51].

"discovery,"[3] as undersigned counsel does not consider the myriad one-sided affidavits (that were not subject to cross-examination) accompanying TIF's dismissal motion practice to be "discovery."[4] Leaving SunMed as the current (as to "current," *see* n. 4) lone Defendant.

Almost immediately (*i.e.*, less than a month) following the conclusion of dismissal motion practice (concluding for now, *see* n. 4, as of the Court's August 25, 2021, TIF-related dismissal Order), SunMed moved the Court to summarily adjudicate this case.[5] SunMed was so fast to pull the MSJ trigger, in fact, that Med-X had barely had the chance to propound a first request for production on SunMed (propounded on September 13, 2021) that was not even merits-based. "Not even merits-based" because Med-X's first request for production had little (if anything) to do with the Claim decision-making (*e.g.*, substantial underpayment of benefits on the covered Claim; *i.e.*, the merits of this action), it had mostly (if not everything) to do with the corporate relations (so to speak) between TIF and SunMed because such bears on the TIF personal jurisdiction issue that Med-X will be asking the Court to reconsider equipped (hopefully) with more than one-sided defense affidavits. Since the Court did not afford Med-X the requested relief needed to carry out "limited, jurisdictional-oriented discovery" with TIF before ruling on TIF's motion to dismiss, *see* [D.E. 56] at n. 11, Med-X's first request for production seeks to do so with SunMed. "Seeks" (rather than "sought") because Med-X is not yet certain what SunMed's production consists of –

---

[3] This being this brief's first mention of discovery (more on that below as it relates to the prematurity of the MSJ), it is worth reminding the Court that, procedurally speaking, this case is in its relatively nascent stages. *See* the June 29, 2021, Scheduling Order [D.E. 62] (setting, for example, the discovery deadline at January 31, 2022).

[4] But, as Med-X has alluded, *see* [D.E. 76] at ¶ 2(g), Med-X intends to move the Court for reconsideration of the aforementioned dismissal Order following prospective discovery.

[5] SunMed was actually hastier than that in pulling the MSJ trigger. SunMed had actually filed a motion for summary judgment on September 16, 2021, but then withdrew that filing and re-filed on September 22, 2021 [D.E. 72].

SunMed produced documents on October 20, 2021, and Med-X has not yet had an opportunity to fully and meaningfully review same because undersigned counsel does not speak Spanish and the first approximate 170 pages of SunMed production is in Spanish.[6]

For reasons now discussed (*see also* the contemporaneously filed SOF), the MSJ should be denied (or significantly postponed, in the alternative). As should be plain from the below discussion, there are myriad genuinely disputed material facts militating against summary judgment. Summary judgment would not be appropriate (if ever appropriate in this case for any party) until discovery has concluded, until after it is determined through discovery whether or not TIF was rightly dismissed (*i.e.*, until after the unilateral affidavits accompanying TIF's motion to dismiss are fact-checked through a two-sided, due process compliant discovery campaign, involving, in part, cross-examination), and / or until after it is determined through discovery whether or not Med-X / undersigned counsel was given accurate information as to which original Defendants to voluntarily dismiss.[7, 8]

---

[6] Informal translation efforts are underway vis-à-vis Med-X (who has staff fluent in Spanish), but not yet complete. "Informal" for now because this dispute has already been quite costly enough for Med-X; *e.g.*, Hague Convention service due to Defendants' (and / or defense counsel's) unnecessary unwillingness to accept service.

[7] Given what has now been said / argued in relation to TIF's motion to dismiss and SunMed's MSJ, Med-X / undersigned counsel is seriously questioning whether proper / full information was provided in relation to the involvement, liability, and / or damages exposure of original Defendants who were voluntarily dismissed predicated on such information. IWIA is a glaring example. SunMed's MSJ does a lot of finger pointing towards IWIA, and TIF, *via* dismissal motion practice (*see, e.g.,* [D.E. 60]), sought to distance itself from SunMed in the agency vein (so as to bolster TIF's personal jurisdiction arguments) by inserting IWIA in-between TIF and SunMed.

[8] Med-X has not yet filed a motion for summary judgment (partial or full) because this case is the epitome of a case where no party (given the present significant factual dispute and the overall nascent nature of the matter … no merits-based discovery) should be afforded summary judgment at present; *i.e.*, the MSJ effort, at this relatively early stage (procedurally speaking) under the case's current undeveloped and genuinely disputed factual landscape, is frivolous.

# MEMORANDUM OF LAW

### A. *Legal Standard*

The Rule 56 summary judgment movant has the initial burden of establishing, based on relevant "portions of the pleadings, depositions, answers to interrogatories, and admissions in the file, together with affidavits if any," that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (internal quotations omitted). "The court construes all evidence and reasonable inferences in the light most favorable to the nonmovant … . Summary judgment is appropriate if the record evidence, so construed, raises no genuine issue of material fact." *Wilson v. Doss*, 552 Fed.Appx. 970, 971 (11th Cir. 2014) (internal citations omitted). A non-movant's relative burden is no more onerous than to show more than some metaphysical doubt as to the material facts. *See, e.g., Matsuhita Electric Industrial v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

### B. *Pending Germane Discovery Precludes Entry of Summary Judgment*

The Eleventh Circuit has held as follows:

> In *WSB-TV v. Lee [842 F.2d 1266 (11th Cir. 1988)],* we reviewed the Supreme Court's decisions in *Celotex,* in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and in *Matsushita Electric Industrial Co. v. Zenith Radio Corporation*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). We concluded that the common denominator of the three cases is 'that summary judgment may only be decided upon an adequate record.' 842 F.2d at 1269. …
>
> The party opposing a motion for summary judgment has a right to challenge the affidavits and other factual materials submitted in support of the motion by conducting sufficient discovery so as to enable him to determine whether he can furnish opposing affidavits. *Parrish v. Bd. of Commissioners of the AL State Bar*, 533 F.2d 942, 948 (5th Cir. 1976). If the... discovery sought would be relevant to the issues presented by the motion for summary judgment, the opposing party should be allowed the opportunity [to so discover].

*Snook v. Trust Co. of Georgia Bank of Savannah, N.A.*, 859 F.2d 865, 870 (11th Cir. 1988). In this Circuit, "a party opposing a motion for summary judgment need not file an affidavit pursuant to

Rule 56[d] of the Federal Rules of Civil Procedure in order to invoke the protection of that Rule." *Id.* at 871. "However, the party opposing the motion for summary judgment bears the burden of calling to the district court's attention any outstanding discovery." *Id.* (internal citation omitted). Undersigned counsel calls to this Court's attention that there is pending germane discovery; in fact, pretty much all discovery is pending.

For example and as discussed above, there are the *several* one-sided / unchallenged affidavits proffered by Defendants throughout the pendency of this action (whether proffered in relation to SunMed's dismissal efforts way back when or TIF's more recent dismissal efforts) and again relied upon in conjunction with the MSJ. Med-X has not had an opportunity to conduct discovery related to those affidavits (*e.g.*, depositions of the affiants) and was / is not required to carry out such discovery three months ahead of the discovery deadline anyway. This alone, per the *Snook* decision (citing to *Parrish*) should preclude summary judgment – per *Snook* (citing to *Parrish*), "the party opposing a motion for summary judgment has a right to challenge the affidavits and other factual materials submitted in support of the motion by conducting sufficient discovery so as to enable him to determine whether he can furnish opposing affidavits." *Id.*, *supra*. Med-X should be allowed to conduct discovery aimed at challenging the various affidavits that the MSJ relies upon.

As another example, and as also discussed above, the universe of Defendants is uncertain. First, there is the issue of whether Med-X was induced into voluntarily dismissing a Defendant (or Defendants) that perhaps should have remained, such as perhaps IWIA. *See* n. 2 and n. 7, *supra*. Second, Med-X presently plans on challenging the dismissal of TIF in a timely fashion, which

6

involves discovery along the lines now discussed.[9] Promptly after the Court's TIF-related dismissal Order, Med-X propounded a request for production on SunMed relating to the personal jurisdiction issue that TIF's motion to dismiss revolved around. As discussed above, SunMed's production was relatively recent and Med-X is still reviewing same due to, for example, a large chunk of the production being in Spanish. Once the review of that production is complete, Med-X would seek to depose a SunMed corporate representative as to the TIF-related personal jurisdiction issue. After that, Med-X would assess whether or not it is necessary to seek discovery (written and / or oral) from the now non-party that is TIF concerning the personal jurisdiction issue that TIF's motion to dismiss revolved around. Then, and only then, would a motion for reconsideration concerning the Court's TIF-related dismissal Order be well-informed and / or otherwise appropriate. Under either Rule 60 timing standard (*see* n. 9, *supra*), Med-X has timely begun the discovery that will be needed to lodge an informed motion for reconsideration. Before a case is summarily adjudicated for anybody, the universe of Defendants (and evidence concerning the relationships between such Defendants and roles / responsibilities of all such Defendants) should be certain, and here such is anything but certain. And, again, all merits-based discovery is outstanding. Both the fact that there is great uncertainty as to what Defendants should be in the mix (so to speak) and who is truly responsible / liable for what (and associated discovery outstanding) and the fact that all substantive discovery concerning the Claim (and the current last remaining Defendant, SunMed) is outstanding, renders it premature for the Court to summarily adjudicate this matter roughly three months before Med-X was / is required to complete discovery.

---

[9] As to "timely," some Rule 60 relief must be pursued "within a reasonable time," whereas some Rule 60 relief must be pursued "no more than a year" after the Court action being challenged. *See* Fed. R. Civ. P. 60(c)(1).

7

As another example, per the United States Supreme Court's *Catrett* case, pleadings are a central piece to the Court's analysis of whether a party moving for summary judgment has carried its burden in demonstrating that there is no genuine issue of material fact. Here, it would be impossible for the Court to definitively ferret out, among other things, whether Defendants have achieved their burden given the "pleadings" (*e.g.*, SunMed's answer and affirmative defenses), which, again, are a cornerstone of a "no genuine issue of material fact" showing, have not been subjected to any discovery. For example, as made clear by the Eleventh Circuit in *Snook*, *supra*, Med-X is allowed to utilize discovery (*e.g.*, corporate representative deposition, and merits-based written discovery which is not what the only request for production thus far captures) to challenge such outstanding SunMed responses to Second Amended Complaint averments and affirmative defenses. It would be premature for the Court to summarily adjudicate this case sans discovery aimed at and dissecting SunMed's pleading (answer and affirmative defenses) from which SunMed's MSJ flows. Distilled, every single argument advanced by SunMed in its MSJ hinges on principal / agent issues weaving back and forth between SunMed, IWIA, and TIF. Each MSJ argument concludes that SunMed's purported "disclosed agent" role affords it a liability get-out-of-jail-free card across the board. The principal / agent issue around which the MSJ entirely revolves stems from SunMed's first affirmative defense, which such defense disclaimed liability under the notion that SunMed is a mere third-party administrator; *i.e.*, mere agent. Med-X should be allowed to carry out (or, rather, finish) discovery as to SunMed's first affirmative defense, along with all other affirmative defenses (and / or Second Amended Complaint averment denials). "Finish" because SunMed's response and production to Med-X's first request for production (which such request for production did, to some extent, hit on agency-like topics) did not come close to closing the loop as to which Defendant was principal, which Defendant was a direct agent

of the principal, which Defendant was an agent of an agent, and, among it all, which Defendants were responsible for what in relation to the Claim.[10]

Per just these few examples of critical topics that Med-X should be allowed discovery on, the MSJ should be denied. Or, alternatively, resolution of the MSJ should be postponed until when the dispositive motion practice window in this case was / is supposed to be,[11] such that a fully developed evidentiary record (rather than the current barebones evidentiary record consisting mainly of unilateral, unchallenged defense affidavits) is in place. Indeed, the parties (including SunMed) previously recognized that such order of operations is the proper course. In the parties' proposed scheduling order, the parties (again, including SunMed … indeed, it was SunMed's counsel who spearheaded the scheduling report / proposed order process) jointly stated, in pertinent part, as follows:

---

[10] A copy of Med-X's first request for production to SunMed is attached hereto as **Exhibit A** and incorporated herein by reference. Also attached as part of Exhibit A is SunMed's response (replete with objections and unresponsiveness) to the request for production (sans production, of course), which such response is also incorporated herein by reference.

[11] Per the Scheduling Order just entered a few months ago, the deadline for filing dispositive motions was / is February 14, 2022, which is two weeks after the January 31, 2022, discovery deadline elapses. *See* [D.E. 62]. That is a tight turn-around, but that at least puts dispositive motion practice where it should be – after the completion of germane fact discovery. The potentially conflicted part of the Scheduling Order [D.E. 62] is that the expert deadline (a key facet of the discovery process as a whole, which such expert testimony / reporting could also very well bear on dispositive motion practice) is scheduled for April 4, 2022, a little more than two months after the dispositive motion deadline. Med-X (and SunMed) respectfully submits that the expert deadline and dispositive motion deadline should be flipped around. "And SunMed" based on the parties' proposed deadlines for fact discovery, expert discovery, and dispositive motion practice were March 11, 2022, March 11, 2022, and March 25, 2022, respectively. *See* [D.E. 61], Ex. 1. SunMed concurred with the dispositive motion practice deadline falling after the completion of all discovery (fact and expert), not just after the completion of fact discovery. Whether the Court would entertain adjusting the Scheduling Order [D.E. 62] to flow more naturally with a standard litigation process (allowing all discovery to be completed before entertaining summary judgment) will remain to be seen; but, again, the takeaway for purposes of the instant motion practice is that SunMed recognized the propriety of creating a scenario wherein dispositive motion practice could / should "include all relevant arguments."

> Based on the dates prescribed in the Standard Track 'Attachment B,' Expert Discovery would close after both the dispositive motion deadline and the pre-trial motion deadline. *To afford the parties the opportunity to* complete all expert discovery and *include all relevant arguments* associated with expert discovery *into their dispositive motions* and pre-trial motions, these deadlines were revised accordingly.

[D.E. 61], Ex. 1 at n. 2 (emphasis added). The parties (including SunMed) recognized the importance of being "afford[ed] … the opportunity to … include all relevant arguments … into … dispositive motions" vis-à-vis the completion of discovery / the solidification of the evidentiary record (including expert discovery). Resolving SunMed's MSJ now, predicated on a relevant evidentiary record (according to SunMed) consisting of no more "evidence" than Defendants' one-sided and unchallenged affidavits (to the extent such affidavits can realistically be considered evidence in their current unchallenged state) and roughly three months before expiration of the current fact discovery deadline, would improperly deviate from what the parties (and the law; *e.g.*, *Snook*) recognize is the proper course – allowing for the completion of discovery so as to be able to include all "relevant arguments" in dispositive motion practice.

**C. SunMed Was Anything But A Mere "Disclosed Agent" With No "Contract" Connection**

To some degree or another, each section of the MSJ hinges on it first being established that SunMed was a "disclosed" agent of IWIA, thereby somehow absolving SunMed of any liability. There is the epitome of genuine dispute as to this "material" "fact." As it concerns the parties, Med-X expressly disclaims any sort of agency-related "disclosure" having been put forth to it by SunMed at all material times (with the "material times" being the Claim process; *i.e.*, shortly leading up to L.H.'s hospitalization up to and including the date of L.H.'s discharge from the subject hospital). *See* Med-X Affidavit, attached hereto as **Exhibit B** and fully incorporated herein by reference. Because there is virtually zero merits-based discovery (oral or written) that has unfolded in this action between Med-X and SunMed (and zero merits-based discovery, oral or

written, that has unfolded with purported "principals," such as TIF and / or IWIA), the only "evidence" to work with are the parties' affidavits. The bulk of the affidavits relied on by SunMed in the MSJ constitute hearsay as it pertains to SunMed, as the bulk of such affidavits come from individuals (within TIF, for example) not within SunMed and from entities (TIF, for example) who SunMed's MSJ actually seeks to distance SunMed from in the "disclosed agent" versus "principal" arguments around which the MSJ revolves. Med-X's affidavit (Ex. B), however, comes directly from Med-X.

     Med-X is a reputable, upstanding, well-experienced, and sophisticated entity within the insurance industry. Med-X (in its affidavit, *see* Ex. B) completely disputes the MSJ notion that SunMed was a "disclosed" agent. In the same vein, Med-X (in its affidavit, *see* Ex. B) completely disputes the notion that SunMed's actual actions in relation to the subject dispute (holding itself out to Med-X as the be-all-end-all as to all things Claim at all material times throughout the Claim process) constituted mere powerless, pawn-like stature of a mere conduit ilk. Again, as is made clear in Med-X's affidavit (*see* Ex. B), at all material times SunMed held itself out as (and acted accordingly as) the sole Claim decision-maker (*e.g.*, hospitalization, GOC, assessment of the subject hospital's pricing schedule, Claim payment, and *et cetera*). Indeed, for example, as alleged in the Second Amended Complaint (bolstering the Med-X affidavit, Ex. B, or *vice versa*), it was SunMed who haggled with Med-X for weeks over the subject hospital's fee schedule and associated Claim payment amount. *See* [D.E. 15] at ¶ 20. This is not the conduct of a mere faultless pawn conduit "disclosed agent." This is the conduct of **the** Claim decision-maker. Indeed, as another example, as alleged in the Second Amended Complaint, SunMed was enlisted (in part) to arrange the hospitalization of L.H. at Amerimed while assessing which area hospital L.H. would find coverage at. *See id.* at ¶ 17. SunMed's MSJ does not quarrel with this fact. *See* [D.E. 72] at 2

(incorporating Paragraph 17 of the Second Amended Complaint for introductory purposes). This is the conduct of **the** Claim decision-maker, not a mere faultless pawn conduit of some principal as the MSJ contends SunMed was / is. Indeed, as another example, as alleged in the Second Amended Complaint, it was SunMed who issued the GOC. *See* [D.E. 15] at ¶ 17. And SunMed's MSJ does not quarrel with this fact. *See* [D.E. 72] at 4 (incorporating Paragraph 17 of the Second Amended Complaint into the MSJ argument). This is the conduct of **the** Claim decision-maker, not a mere faultless pawn conduit of some principal as the MSJ contends SunMed was / is. And, it is at this point that the GOC deserves greater discussion in the realm of demonstrating that SunMed was anything but a mere faultless pawn conduit of some principal, because the MSJ's discussion of the GOC leaves out a key aspect of the GOC.

The GOC is cited in greater detail at Paragraph 17 of the Second Amended Complaint. Part of the GOC cited in the Second Amended Complaint but not cited in the MSJ reads as follows:

> All of the expenses generated during this medical process will be reimbursed in accordance to the existing contract (with SunMed International). … In order to facilitate the payment process, all the original medical claims should be mailed to the address mentioned above to the attention of SunMed's International Division.

*See* GOC, attached hereto as **Exhibit C** and fully incorporated herein by reference. First, what "existing contract with SunMed International"? That remains to be seen with germane discovery pending, and, again, the fact that there is germane discovery pending precludes summary adjudication at this juncture. But, perhaps most importantly, this portion of the GOC is advising the reader that SunMed (through its contract) establishes / determines pricing; *i.e.*, Claim payment. This portion of the GOC is advising the reader that the "payment process" flows through SunMed by way of claim submission to SunMed. This is the conduct of the **the** Claim decision-maker, not a mere faultless pawn conduit of some principal as the MSJ contends SunMed was / is.

Again, SunMed was **the** source for all things Claim (*e.g.*, hospitalization, GOC, hospital fee schedule "negotiation," Claim payment) and this, according to the GOC, was established vis-à-vis a SunMed contract. And this reality of there being a SunMed contract spelling out SunMed's Claim payment parameters also militates against SunMed's MSJ chatter, *see* [D.E. 72] at Section D, that there is nothing of a contractual / agreement / note / memorandum ilk linking it to the Claim payment (or even just the Claim, generally) such that the statute of frauds (Section 725.01 of the Florida Statutes) somehow applies. SunMed's own GOC (which Med-X contends is itself a contract) accepts Claim payment responsibilities by way of (at least in part) a SunMed contract. The MSJ's discussion of Section 725.01 acknowledges that the statutes of frauds concept does not apply in this scenario wherein Claim payment was to unfold under a SunMed contract applying to "reimburse[ment]" of "all of the expenses generated during this medical process." The statute of frauds applies "unless … some note or memorandum [or agreement] thereof" is in play, *see* [D.E. 72] at 10 (citing Section 725.01), as it is here.

Finally, there is the cursory Section E of the MSJ. *See* [D.E. 72] at 11. Again, this SunMed argument hinges, at least in part, on "acting at all times as agent for its client, IWIA." Again, the concept of SunMed avoiding liability under some "disclosed agent" argument and associated finger pointing at a purported principal (IWIA) who we have not yet heard anything from in this litigation, is dispelled above. But Section E of the MSJ is also amiss on other grounds. Section E of the MSJ argues the elements of a run-of-the-mill written contract cause of action, contending that there was no written agreement in place between SunMed and Med-X. First, and again, Med-X contends that the GOC (and related representations therein, such as SunMed guaranteeing coverage and then directing the reader to SunMed for Claim submission and Claim payment) constitutes a written contract; indeed, Med-X performed pursuant to and under the GOC. But,

second, the conduct of SunMed at all material times with Med-X (*i.e.*, course of dealings between Med-X and SunMed) detailed above and in the Second Amended Complaint certainly lends itself to the various other ways in which a "contract" can be established.

- "An implied in fact contract is one in which some or all of the terms are inferred from the conduct of the parties and the circumstances of the case, though not expressed in words. In a contract implied in fact the assent of the parties is derived from other circumstances, including their course of dealing or usage of trade or course of performance." *McMillan v. Shively*, 23 So.3d 830, 831 (Fla. 2009) (internal citations omitted).
    - While Med-X contends that any SunMed contract derived in relation to the insurance contract (Exhibit A of the Second Amended Complaint), in particularly when that SunMed contract dictated Claim payment (a key feature of the underlying insurance contract), it is intertwined with the insurance contract and / or places SunMed within the confines of the insurance contract for all legal intents and purposes.[12] But, in the alternative and at the very least, the contractual relations / course of dealings between Med-X and SunMed concerning the Claim also take the form of implied in fact contract.
- "Contracts implied in law, commonly called 'quasi-contracts,' are obligations imposed by law on grounds of justice and equity, and do not rest upon the assent of the contracting parties." *Tipper v. Great Lakes Chemical Co.*, 281 So.2d 10, 13 (Fla. 1973).

---

[12] And, again, SunMed also undertook other key features of the underlying insurance contract, not just Claim payment; *e.g.*, hospitalization arrangement, "negotiation" of hospital pricing, and Claim submission. Again, put differently, SunMed operated within the confines of key tasks intertwined with the underlying insurance contract itself, rendering it privy and subject to such contract.

- o Here, amidst the Med-X / SunMed course of dealings discussed above (SunMed holding itself out to and conducting itself with Med-X at every turn throughout the material times of the Claim process as **the** Claim decision-maker as to all basic, chief Claim functions – hospitalization, GOC, hospital fee schedule "negotiation," Claim submission, and Claim payment under "SunMed contract") certainly militates towards an implied in law contract at the very least, one aimed at upholding justice and equity.
- To state a cause of action for breach of oral contract, a plaintiff is required to allege facts that, if taken as true, demonstrate that the parties mutually assented to a "certain and definite proposition" and left no essential terms open. *Jacksonville Port Authority v. W.R. Johnson Enterprises, Inc.,* 624 So.2d 313, 315 (Fla. 1st DCA 1993) (internal citations omitted), *rev. denied*, 634 So.2d 269 (Fla. 1994).
  - o Here, there was undeniable mutual assent between Med-X and SunMed as to the "certain and definite proposition" of, at the very least, L.H. hospitalization, GOC, hospital fee schedule "negotiation," Claim submission, and Claim payment. Hospitalization / medical services, coverage, claim submission, payment amount, and payment leaves practically nothing (if anything) open as to what matters with respect to a health insurance claim.[13]

---

[13] Whether it be with respect to implied in fact contract, implied in law contract, and / or oral contract, we again believe such would be inextricably intertwined with the underlying insurance contract. It is not at all uncommon in the insurance industry for an underlying insurance contract to be qualified by and / or governed by other contracts formed with administrators. Indeed, this happens quite regularly in the domestic commercial insurance context wherein there is an underlying insurance contract, but that insurance contract gets carried out pursuant to separate (but intertwined) single case agreements / contracts and / or third-party re-pricing contracts. In those instances, which undersigned counsel has a great deal of experience with, those additional contracts are not ordinarily attached to the complaint (or necessarily required to be attached to the

In sum, every section of the MSJ relying on SunMed's unsubstantiated (and evidentiarily contradicted, *see* Med-X Affidavit as Exhibit B and GOC as Exhibit C) argument that it had zero responsibility and was a mere pawn conduit (*i.e.*, "disclosed agent") is heavily contradicted / disputed. And the central (if not only) issue that the MSJ tees up is the bit about "disclosed agency" with some principal in relation to whom there has been no discovery.[14] The MSJ is due to be denied on the fundamental summary judgment standard concerning "genuine issue of material fact:" "The court construes all evidence and reasonable inferences in the light most favorable to the nonmovant … . Summary judgment is appropriate if the record evidence, so construed, raises no genuine issue of material fact." *Wilson v. Doss*, 552 Fed.Appx. 970, 971 (11th Cir. 2014) (internal citations omitted). A non-movant's relative burden is no more onerous than to show more than some metaphysical doubt as to the material facts. *See, e.g., Matsuhita Electric Industrial v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Here, Med-X has certainly shown "more than some metaphysical doubt as to the material facts."

WHEREFORE, Plaintiff, Med-X Global, LLC, respectfully requests that the Court enter an order (a) denying the September 22, 2021, Motion for Summary Judgment [D.E. 72] filed by Defendant, SunMed International, LLC, in its entirety, (b) in the alternative, continuing /

---

complaint) as the basis for the breach of contract action, just the underlying insurance contract (*i.e.*, the root contract) is typically attached (as here). In the event, however, that the Court feels as if there should be separate causes of action relating to the above three alternative (but intertwined) contract-oriented causes of action, we would respectfully suggest that the proper course would be Second Amended Complaint amendment, not summary judgment. Note: the Complaint was only amended twice based on the Court's *sua sponte* inquiries of a non-substantive nature and Med-X's clerical changes (so as not to run into Hague Convention service issues) of a non-substantive nature.

[14] SunMed's "disclosed agent" argument points the finger at purported principal IWIA. And, yet, of all the unilateral, unchallenged defense affidavits floating around, not a single one comes from IWIA.

postponing disposition of the Motion for Summary Judgment until germane discovery has concluded, or (c) affording Med-X any other relief the Court deems just, proper, and / or equitable.

Respectfully Submitted,

**CALLAGY LAW, P.C.**
*/s/ Jeffrey L. Greyber*
**Jeffrey L. Greyber, Esq.**
Florida Bar No. 41103
1900 N.W. Corporate Blvd., Ste 310W
Boca Raton, Florida 33431
(561) 405-7966 (o); (201) 549-8753 (f)
jgreyber@callagylaw.com
hcasebolt@callagylaw.com
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of November, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record *via* transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ Jeffrey L. Greyber*
**Jeffrey L. Greyber, Esq.**